[No. 20906.  Department Two.—December 1, 1893.]

# THE PEOPLE, RESPONDENT, *v.* WILLIAM G. LANE, APPELLANT.

CRIMINAL LAW—HOMICIDE—SHOOTING BY ARRESTING OFFICER—EVIDENCE —SUBSEQUENT SHOOTING AT THIRD PERSON—RES GESTÆ—MOTIVE.— Upon the trial of a charge of murder against a constable who had entered a house of ill-fame with a *posse,* for the purpose of arresting the deceased and a third person for residing therein, and who, while in the house, in a scuffle with the deceased fired the shots which caused his death, evidence as to a subsequent shooting by the constable, out of the house, at the third person, after the deceased had fallen in the house, and after such third person had examined him and found the wound, and had started out of the house to find a physician, is not admissible, as part of the *res gestæ,* nor to show a motive or intention of the accused to kill the deceased.

ID.—EVIDENCE OF DISTINCT OFFENSE—COLLATERAL FACTS—LOGICAL INFERENCE.—As a general rule, evidence of a distinct and substantive offense cannot be admitted to show the commission of another offense, and this rule excludes all evidence of collateral facts, or those which are incapable of affording a reasonable presumption or logical inference as to the principal fact or matter in dispute; and evidence of another offense cannot be given unless there is some clear connection between the two offenses by which it may be logically inferred that if guilty of the one the defendant is also guilty of the other.

ID.—INSTRUCTION—INTOXICATION.—Where the accused is charged with murder, which includes the offense of manslaughter, it is proper for the court, in its instruction to the jury upon the subject of his intoxication, to give the whole of section 22 of the Penal Code; and it is not error to include in the charge the first clause of that section, which declares that "no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition," that clause being applicable to the offense of manslaughter; though it would not be proper to omit that portion of the section which qualifies that rule in cases where the actual existence of an intention is a necessary element of the offense.

APPEAL from a judgment of the Superior Court of Fresno County.

The facts are stated in the opinion.

*R. B. Terry, S. J. Hinds,* and *W. B. Tyler,* for Appellant.

*Attorney-General W. H. H. Hart,* and *W. D. Tupper,* for Respondent.

HAYNES, C.—The defendant was tried for the murder of William G. Canfield. The jury returned a verdict of guilty of murder in the first degree, with imprisonment for life. This appeal is from the judgment rendered upon the verdict, and from an order denying defendant's motion for a new trial.

Appellant, at the time of the homicide, was a constable at Sanger, Fresno county. Late at night he went to a house of prostitution for the purpose of arresting the deceased and one Coleman for residing in a house of ill-fame, taking two men whom he found upon the street as a *posse* to aid him in making the arrest. Arriving at the house appellant knocked at the door, and replied to a question from one of the inmates that he was Lane, the constable. The girl opened the door, when appellant and the other two men entered, and appellant then said he "wanted every man in the house."

George Glenn, one of the men who went to the house with the constable, was called on behalf of the people, and testified that Lane told him he had to go with him, and that he was going to arrest "these men." That another man was with Lane whom he did not know, and had never since seen; that when the door was open he walked in with Lane; "that Canfield came out of one of the rooms, and Lane said, 'you can consider yourself under arrest,' or words to that effect; that Canfield said, 'What authority have you to arrest me? Show me your warrant,' and Bill [meaning Lane] had his gun in his left hand, and at that Canfield made a grab for the gun, and Bill put out his right hand and says, 'come, go with me,' and he was grabbing the gun at that time, and when the scuffle started with the gun I turned round and left. I ran away. I heard a shot when I got about fifty yards from the house."

Loe Wilson, called for the people, testified that she opened the door when defendant said he was a constable, and he and two other men came in. That Lane then said he wanted every man in the house; that Canfield came forward and asked Lane where his warrant

was; that Lane had a revolver in his hand, and replied,
"this is my warrant"; that witness could not remember
how he had the revolver. "He had it right in front of
him. I think Mr. Canfield pushed his hand up to keep
him from shooting him." That just then she heard a
shot; that she heard two shots in the house. After the
second shot was fired, Canfield walked back in the hall
and said he was shot; and that she thought Lane had
gone outside of the house. The witness could not tell
how long a time elapsed between the two shots, but
thought one was right after the other; that she did not
see the second shot fired, because she had turned to go
back in the hall; that when the first shot was fired they
were standing close together, face to face; that at the
time the second shot was fired they were standing up
and Lane had hold of Canfield.

Emma Newman did not remember anything the de-
fendant said; that Canfield said something about a war-
rant; that when Lane came in he had a pistol in his
right hand; that there were some words between him
and Canfield, and afterwards a scuffle, and then some
shots fired; that she heard the first shot, and went back
in the room (the second room back from the front door),
and was in the room when the second shot was fired;
that "that after the second shot was fired Canfield came
back to the room we were in and said he was shot. He
then turned and walked into the hall again"; that she
next saw Canfield lying by the first door on the right-
hand side; that the light was an ordinary lantern, and
she did not know where that was. The light was dim.

Upon cross-examination the witness testified that
there was a scuffle, but she did not see Canfield grab
the pistol; that he was trying to hold Lane with one
hand and push him out of the house, and thought he
was trying to get the pistol, and they were still strug-
gling when she got back to the door; that they struggled
"about three, or four, or five minutes, probably; Can-
field was trying to throw him back, to throw him out.
He was trying to get hold of something; I supposed it

was the pistol." They were not struggling when the first shot was fired. She thought they were not together; that Canfield was between the witness and Lane; that she was not noticing Canfield particularly; was anxious about Miss Wilson.

Coleman testified to the conversation at the door substantially as the other witnesses. He remained in the back room, and it does not appear that he saw any part of the transaction; or that he was seen by Lane; that the first he saw was Canfield on the hall floor after he was shot, but that the two shots were close together, "crack, crack, just as fast as you could pull," and indicated by clapping his hands at an interval of about half a second.

After Canfield fell in the hall Coleman examined him, and found the wound in his back, which a medical witness described as about one inch and a half from the spinal column, fracturing the eleventh rib, and ranging inwards and upwards, and from which death resulted about a week later.

After Coleman discovered the wound he started to find a physician, and was permitted, against the objection of defendant, to testify as follows: "When I started the defendant had gone out of the house. I went out of the front door. I went down, ran down the steps, and I got a short distance away when there were two shots fired. I heard this defendant say, 'there is the son of a bitch I want,' and some one with him replied in a low tone to him. I don't know what he said, I did not see him; and immediately after saying that, as quick as possible, I heard the clink of the gun, and I dropped. I throwed myself on the ground to get out of range. There were two shots fired. They both went over me or by me. Then I went for the doctor, got him, and came back with him."

The time between the shooting of Canfield and the firing of the shots outside of the house is variously estimated by the witnesses. Emma Newman placed it

at about ten minutes. Loe Wilson said "a few min-
utes"; and Coleman, "two or three minutes."

Appellant duly excepted to the admission of the evi-
dence of the shooting at Coleman, and contends that
the ruling admitting it was erroneous.

Respondent contends that it was admissible upon
either of two grounds: 1. That the shooting of Cole-
man after he left the house was a part of the *res gestæ.*
2. That considering it as a distinct offense, it was com-
petent to show motive, or intention to kill, and that
the killing of Canfield was not, as defendant claimed,
accidental.

The importance of the questions here presented can
scarcely be overestimated.

If the evidence as to what occurred in the house made
it clear that appellant, of his willful, deliberate, and pre-
meditated malice, murdered Canfield, no necessity ex-
isted to prove the subsequent shooting at Coleman;
whilst if it did not make it clear that the killing was of
the deliberate, willful, and premeditated malice of appel-
lant, the verdict finding appellant guilty of murder in
the first degree was wrong, unless the jury could find
from the subsequent occurrence that the killing of Can-
field was deliberate and premeditated. No one except
the jurors can tell whether the deliberation and pre-
meditation which the jury found to have existed was
based upon the one set of facts or the other, or upon
both.

That the shooting at Coleman was not part of the *res
gestæ* is clear. The thing in litigation was the killing
of Canfield during a struggle in the house. The fatal
wound had been given, the struggle ended, and appel-
lant had left the house. How long a time had elapsed,
whether three minutes or ten minutes, is immaterial.
What occurred outside of the house was no part of the
transaction which occurred in the house. That was
entirely ended so far as appellant was concerned. "As
soon as we pass the line which distinguishes between
the transaction talking of itself, and talking as modify-

ing the transaction—in other words, as soon as we pass the line between the time of the transaction and the time that follows it—we have no limits that can be imposed." (Wharton's Criminal Evidence, 9th ed., sec. 262.)

"An act cannot be varied, qualified, or explained either by a declaration which amounts to no more than a mere narrative of a past occurrence, or of an isolated conversation held, or an isolated act done, at a later period." (1 Taylor's Evidence, 52.)

It is urged by counsel for respondent that the two acts could not be more contemporaneous than they were; that "the double shooting sprang as offshoot performances from one central impulse and impetus, to wit: The drunken, brutal assault upon the house." But the assault upon the house was not the issue being tried: it was the murder of Canfield; a single substantive offense. If, during the struggle between appellant and Canfield, Coleman had appeared, and, to prevent his interference, or with a deliberate purpose had killed him, it would have formed a. part of the transaction, and as such could have been given in evidence. I can perceive no such relation between the two acts as make the second a part of the one act under investigation. *People* v. *Ah Lee*, 60 Cal. 85, and *People* v. *Wong Ark*, 96 Cal. 126, discuss the question, especially in relation to declarations; but the principles there announced, I think, fully sustain my conclusion that the shooting at Coleman was not a part of the *res gestæ* which were then under investigation by the jury. Nor do I think the admission of the evidence in question can be sustained upon the second ground above mentioned.

The learned counsel for the people say that it is claimed that the killing of Canfield was accidental; that, "since motive is the only question now to be investigated, this testimony was rightly introduced," and ask the significant question: "Will it be maintained for an instant that the jury must be denied this light, and must be compelled to grope about in the dark

to determine how the shooting was done, and in what frame of mind defendant was in when he killed deceased?" while appellant contends that without that testimony the jury could not have found the defendant guilty of a higher offense than manslaughter. It would, therefore, seem to be conceded that this evidence was controlling in its effect; and its admissibility should therefore be carefully considered, lest the appellant should escape the just punishment of his offense, or be punished for an offense he did not commit.

That evidence of a distinct and substantive offense cannot be admitted in support of the charge of the commission of another offense is a general rule laid down by all the authorities. This rule excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute. The most familiar exceptions to the general rule above stated are cases of passing, or offering to pass, counterfeit money. As one may innocently pass, or offer to pass, a counterfeit bill or coin, not knowing that it is such, proof of prior passing, or offers to pass, the same, or similar counterfeits, is competent for the purpose of proving guilty knowledge, even though such proof shows the commission of another and complete offense.

The general rule above stated is in fact but the reiteration of the still more general rule that, in all cases, civil or criminal, the evidence must be confined to the point in issue. "No fact which, on principles of sound logic, does not sustain or impeach a pertinent hypothesis is relevant; and no such fact therefore, unless otherwise provided by some positive prescription of law, should be admitted as evidence on a trial. The reason of the rule is obvious. To admit evidence of such collateral facts would be to oppress the party implicated by trying him on a case for preparing which he has no notice, and sometimes by prejudicing the jury against him." (Wharton's Criminal Evidence, sec. 29.) "In criminal cases there are peculiar reasons why the test

before us should be applied to proof of collateral crimes." (Wharton's Criminal Evidence, sec. 30.)

Applying these tests to the evidence in question it must be remembered that there was no question that the fatal wound was inflicted by a ball discharged from appellant's pistol; and the questions to be resolved were:

1. Was the shooting accidental or intentional? 2. If intentional, was it deliberate and premeditated?

Any inference to be drawn from a subsequent offense, or act constituting an offense, must be a logical inference. It is true that it is not necessary that the collateral offense, whether prior or subsequent, should conclusively prove the guilt of the accused of the offense for the commission of which he is being tried in order to render it admissible in evidence; but as evidence of another offense manifestly tends to his prejudice there ought to be some clear connection between the two offenses by which it may be logically inferred that if guilty of the one he is of the other. It is not like the admission of some collateral fact which, if it does not, in the opinion of the jury, prove the fact intended, yet leaves no stain or prejudice to color or pervert the direct evidence of the offense under investigation.

That there was no logical or necessary connection between the intent with which the shots were fired at Coleman and the intention, or absence of intention, with which the shots were fired in the house, is, I think, clear. The circumstances were different, the persons were different, the result was different, and the times of the two transactions, though not widely separated, were different. The only link connecting the two, if it may be so called, was that appellant went to the house to arrest both, and that fact therefore only proves the intention to arrest, not to kill. It is obvious that Lane may have fired the shots in the house accidentally, or without any intention of taking the life of Canfield, or in necessary self-defense, and yet have instantly formed the purpose to kill Coleman when he saw him come out

of the house. None of the circumstances of the case indicate that appellant went to the house with a pre-existing intention of taking the life of any one, and the court correctly charged the jury that no appreciable time was necessary for deliberation or premeditation, and certainly that was true of the intention to kill Coleman, if it existed.

Counsel for appellant cites the case of *Farris* v. *People,* 129 Ill. 521, 16 Am. St. Rep. 283, in which this question was fully considered and many cases cited. The court, after stating that testimony which is relevant to the issue is not to be excluded, because it tends to prove the commission of another crime, said: "But the general rule is against receiving evidence of another offense, and no authority can be found to justify its admission, unless it clearly appears that such evidence tends in some way to prove the accused guilty of the crime for which he is on trial."

Agnew, J., in *Shaffner* v. *Commonwealth,* 72 Pa. St. 65, 13 Am. Rep. 649, said: "If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt." In that case the prisoner was indicted for the murder of his wife by poison. There was evidence of his criminal intimacy with the wife of S., on whose life there was an insurance, the proceeds of which on his death the defendant had tried to procure. It was held that evidence that S. died with the same symptoms as the defendant's wife, and had been attended by the defendant, was inadmissible.

In the case of *Farris* v. *People,* 129 Ill. 521, 16 Am. St. Rep. 283, Farris went to the house of McGehee when the family were at dinner, and, declaring that he had come there to kill him, shot and killed him. Within half an hour after, and before he left the premises he committed a rape upon Mrs. McGehee, and this was put in evidence upon his trial, over his objection. It was con-

tended there, as here, that the prosecution had a right to show all the defendant did from the time he came to the place of the killing until he left it, as part of one and the same transaction; but the appellate court held that the admission of the evidence was error, and reversed the judgment, and this, notwithstanding the opinion of the appellate court that the direct evidence of the homicide was sufficient to justify the verdict of guilty of murder in the first degree, as it could not be known but that the jury, in the absence of the evidence erroneously received, would have spared his life.

In *State* v. *Lapage*, 57 N. H. 245, 24 Am. Rep. 69, it was said by Cushing, C. J.: "I take it to be generally true that any act of the prisoner may be put in evidence against him, provided it has any logical and legal tendency to prove any matter which is in issue between him and the state, notwithstanding it might have an indirect bearing, which in strictness it ought not to have, upon some other matter in issue. It may be that in some cases the danger resulting from such indirect bearing might be so great in comparison with its importance in regard to matters on which its bearing was legitimate, that it ought not to be admitted."

In that case the learned judge, after putting an extreme case, further said: "I mention this case to illustrate the necessity of extreme caution not to admit such testimony unless there can be seen some distinct logical connection, such as the law requires, between the fact proposed to be proved and the fact in issue." (See also the opinions of Ladd, J., and Smith, J., in the same case, and the opinion of Peckham, J., in *People* v. *Sharp*, 107 N. Y. 466; 1 Am. St. Rep. 876; *People* v. *Corbin*, 56 N. Y. 363; 15 Am. Rep. 429; *Coleman* v. *People*, 55 N. Y. 90.)

It is clear that the shooting at Coleman did not tend to show a "motive" for the killing of Canfield, as counsel for the people contend. Motive precedes intention, and is the cause or reason upon which it is formed; and if this testimony clearly tended to show a pre-existing

motive for the killing of Canfield, it would be admissible as tending to show that the homicide was not accidental, but was intentional and premeditated. I have assumed that counsel used the word "motive" in the sense of "intention." But it is obvious that an intention to do an act may exist without any known or ascertainable motive for its existence, and hence, where "intention" is apparent, or may otherwise be shown, it is not necessary to prove a motive.

The contention of the respondent here would oblige the court and the jury to infer, from an intention to kill Coleman, in no wise manifested save by the act of shooting at him, a pre-existing intention to kill Canfield. I can see no clear, logical, or even possible ground upon which such inference could be based, other than that shown by his willingness and moral capacity to commit another offense; and all the authorities agree that such evidence cannot be admitted for that purpose. How an intention which may be, and often is, instantaneously formed, and the existence of which is only shown by a single instantaneous act, can be adopted as a predicate from which an inference can be logically drawn that it existed at any specified time prior to such manifestation, I do not comprehend. That it may have existed before is conceded; but that it did exist before, the subsequent fact does not either logically or clearly tend to prove. Actual or specific intentions, as controlling or prompting action, are largely the creatures of circumstance and opportunity, and are thereby created or changed; while motive, as used in criminal law, implies an evil disposition and willingness to injure, which may exist without any specific intention to injure at all, or to injure in any specific manner; and because of this distinction, collateral evidence may often be both relevant and competent to prove motive, which is comparatively permanent and constant, while it would be neither relevant nor competent to show intention as an isolated fact.

But to sustain the admission of this evidence we must go further than to hold that it is competent to prove an

*intention* to kill Canfield, since the killing may have
been voluntary—intentional—and yet have been only
manslaughter; whilst here the verdict was of murder
in the first degree, which required a finding not only of
an intention to kill, but that it was deliberate, premedi-
tated, and malicious; and if deliberation and premedi-
tation were not shown by the facts occurring in the
house, or by acts preceding them, it could not be shown
by the subsequent facts disclosed by the evidence ob-
jected to.

Appellant further contends that the court erred in its
instruction to the jury upon the subject of his intoxica-
tion. The instruction excepted to gave the whole of
section 22 of the Penal Code. The part of the instruc-
tion excepted to is as follows: "No act committed by
a person while in a state of voluntary intoxication is
less criminal by reason of his having been in such con-
dition." This language, though copied from section 22,
if it had been given alone, would have been erroneous,
because it omitted that portion of the section which
qualified it in cases where the actual existence of an
intention was a necessary element of the offense. But
it was proper to include the part objected to, not only
because it was a part of an entire section upon that sub-
ject, but because the information included the offense
of manslaughter, to which the part objected to was
applicable.

I think the jury were not misled or prejudiced by the
use of the words "crime committed," in another in-
struction, though the word "homicide" would have been
better in that connection.

As the other questions argued by appellant will not
necessarily arise upon a new trial of this case, they need
not be noticed.

I think the judgment and order appealed from should
be reversed and a new trial granted.

SEARLS, C., and VANCLIEF, C., concurred.

For the reasons given in the foregoing opinion, the judgment and order appealed from are reversed, and a new trial ordered.

FITZGERALD, J., McFARLAND, J., DE HAVEN, J.

Hearing in Bank denied.

BEATTY, C. J., dissented from the order denying a hearing in Bank.