[Crim. No. 5403. Second Dist., Div. Three. Oct. 11, 1955.]

THE PEOPLE, Respondent, v. HARRY HAMBLETON CHANNELL, Appellant.

William B. Beirne and Paul P. Selvin for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendant was charged with the crime of burglary in that on December 1, 1952, he entered the house occupied by Robert Newman in Los Angeles with the intent to commit theft. The information alleged two prior convictions, one of burglary in 1918 and one of conspiracy and stealing from interstate shipment in 1944, 34 years and 8 years, respectively, prior to the alleged commission of burglary in Los Angeles. Defendant admitted the prior convictions. The cause went to trial on November 30, 1954. He was convicted by a jury of the offense charged and judgment was pronounced. He appeals from the judgment and the order denying his motion for a new trial. His principal assignment of error is that the court erred in overruling his objections and in denying his motion to strike the testimony of the People's witnesses relating to an alleged offense other than the one for which he was on trial.

The Newman home was located in that part of Los Angeles known as Pacific Palisades. It was on a corner in a residential district. A grass path ran along the west side of the house, across the front of which was a metal gate. Ingress to the rear could be had only by crossing the front lawn and proceeding through the gate and along the grass path. In the front and rear of the house, extending practically the entire width of the property, were grass lawns.

Mr. Newman's bedroom was in the southwest corner of the house. It had two large windows. Mrs. Newman's bedroom adjoined her husband's, separated by a hallway. On the north side of her bedroom facing the rear lawn was a glass slider extending across practically all of the wall. The slider gave a full view of all the lawn to the rear of the house. A dressing room adjoined Mrs. Newman's bedroom, with a bathroom off from it. In Mrs. Newman's bedroom, dressing room, and bathroom there was a total of 75 drawers, 12 doors to closets and cabinets, with shelves in the cabinets.

Shortly after 1 o'clock in the afternoon of December 1, 1952, Mrs. Newman left her bedroom to go to the service porch which was about 80 feet from the bedroom. As she went through her husband's bedroom, she looked through one of the windows and saw an automobile parked at the curb. She went to the service porch, talked to her maid, and received the mail from the maid who went to the mailbox to get it. Mrs. Newman returned through the hallway, placed magazines on her husband's bed, walked to the window in his bedroom and looked at the automobile. It was a black, four-door 1952

Cadillac. She then went into her bedroom and in the reflection in a mirror saw a man in the dressing room. She walked toward the dressing room and said, "Who are you and what are you doing?" There was no reply. She moved closer and repeated the question. The man stood up and walked toward her. She identified defendant as the man. Then: "He said he was from the telephone company and I said, 'I think there is a mistake because we haven't reported anything wrong with our phones.' He then said, 'Don't you have an extension in this room?' I said, 'Yes, if you wait a minute until I get rid of these magazines, I will show you where it is.' Then I went as fast as I could back to the laundry to get my maid." She and the maid returned to her bedroom and no one was there. On her return, she noticed that the car was gone. She was in the man's presence just as long as it took to have that conversation. The drawers of her dressing table, of her dresser, and the glass slider, which previously had been closed, were open. Nothing was missing from the premises. Mrs. Newman testified she was pretty nervous at the time; she was very frightened; she was anxious to get out of the room, and all she could think of was to get out of the room very fast.

The maid testified that as she went to the mailbox she noticed a black car parked in the street and that when she and Mrs. Newman went to the bedroom and dressing room, all the drawers were open. No evidence with respect to fingerprint impressions was introduced.

There was no trouble with Mrs. Newman's phone at that time. Between November 18 and December 3, 1952, no complaint was received by the telephone company concerning service at the Newman home.

Walter Borner testified he was a service salesman for a Cadillac agency in Hollywood; a man named "Robert W. Kirk" brought a Cadillac to the agency for service about 10 or 10:30 or around 11 a. m. on December 1, 1952; Kirk was defendant; Kirk had previously, on November 6, 1952, brought the car in for service and had told the witness he was staying at the Roosevelt Hotel; the car had Maryland license plates, No. 254-882; the work order of December 1, 1952, specified that the work would take about three hours and stated, "Time promised. 4:30 p. m."; the bill was stamped "Paid Dec. 1, 1952"; he did not see defendant pick up the car on that date; defendant picked up the car about 3:30 that afternoon. A floorwalker at the Cadillac agency testified he

saw defendant there "about the last of the year, about December" of 1952.

An attendant at the Hollywood Roosevelt Hotel Garage in Hollywood whose working hours were from 11 at night to 7 in the morning testified he made out various "Daily Storage Sheets," in evidence, dated November 27, 1952, through December 1, 1952; the sheets show that a Cadillac car with Maryland license plates, marked on the sheets "Kirk—R. W." of room 902 of the hotel, was stored in the garage at various times during that period. A sales manager of the Hollywood Roosevelt Hotel identified a Roosevelt Hotel guest registration card and a folio showing charges. These showed that someone had registered as "Robt. W. Kirk" of "Beacon Hall Farm; Chevy Chase, Md." on November 27, 1952, at 5:05 in the evening and had left in the morning of December 2, 1952. The witness did not identify defendant as Kirk, and the signature and writing on the registration card was not proven to be that of defendant.

The evidence with respect to the offense other than the one charged in the information, admitted over defendant's objections, was as follows:

A Mrs. Fleming testified that about November 23, 1951, she had guests at her home in Palm Springs; they had toured her new home for about an hour between 1 and 2 p. m.; they all left for lunch at 2:15; she and her husband returned to the house "around 3:30 to a quarter of four"; she went into her mother's room; all the dresser drawers had been opened and various items were on the floor; the Palm Springs police took fingerprints in the room and took a slip of paper on which the intruder had written his name and address (no evidence was introduced with respect to the fingerprints nor was the slip of paper produced at the trial); she did not see the intruder; her maid had moved into the house in September 1951 but she had not moved in until November 7, 1951.

Mrs. Fleming's maid testified she was employed in November 1951; some time in that month she found a stranger in the Fleming home; it was "around 2:00, 2:30" p. m.; after Mrs. Fleming and the guests left she locked the front and back doors, turned all the lights off, went out to the terrace, collected some glasses and returned to the house; she was in Mrs. Fleming's mother's bedroom when she turned the lights out; as far as she could remember, the drawers of the dresser in that room were closed; she went out to the terrace again and saw a man about "60, 55, 60" in "a very

nice brown suit," standing beside the door in the dining room; she had never seen him before; she asked him what he was doing there; he replied, "Visiting the family"; she asked, "What family?"; he answered, "Robinsons"; she said, "They don't live here"; she asked him for his identification card; he did not have any; she asked, "How did you get here?"; he replied, "A car"; she said, "Where is your car?"; he answered, "Parked across the street"; "Well," she said, "I guess you'll have to write your name down . . . I'd like to have your name and address"; she "got him a paper and pencil and he was trembling very badly, and he wrote his name, and I says, where is your address? And he wrote his address. And then I said, what state? He said, Pasadena. I says, well, please write it down. He was trembling so, he couldn't write. So I wrote the word Pasadena"; while she was talking to the man Mr. Renville rang the back doorbell; she went to that door and let him in; the man handed her the piece of paper after he had written on it; she did not see him do anything with the paper before he handed it to her. When asked whether she saw the man in the courtroom the witness said: "There's a man down there looks like him; he looks familiar. . . . He looks very familiar. The man with the blue suit [indicating defendant]." She saw the man leave the premises; he left by the back door; he went to a large black car parked across the street; the man was in the house about 15 minutes; after Mrs. Fleming's mother came home about an hour later, she went into her bedroom; the drawers were all pulled out.

Ray Renville, a pest control operator, testified he had serviced the Fleming home for over a year before November 1951, weekly in the summer, and monthly during the remainder of the year; on each occasion he saw the maid; he was at the Fleming home in November 1951 about 3 p. m.; the maid let him into the house through the kitchen; he followed the maid into the dining room where he saw a man standing; the man was defendant; the maid asked the man "what are you doing here?"; the man said he was looking for some people by the name of Robinson; the maid "wanted to know his address. So he wrote out his name. I believe he gave her the name of Hubbard. Whether it was a friend of his in Pasadena—he give [sic] her a Pasadena address"; the man wrote with a pencil on a piece of paper "and then he sort of seemed to scuff his fingerprints, as he handed it to the maid"; the maid took it; the man turned around, went out

the front door, went across the street to where his car, a black four-door 1951 Cadillac, was parked, got into it and drove away; he and the maid watched him through the kitchen window; the car was about 75 feet from the window; the man had to back the car away from where it was parked; the street he was parked on ends there; ''[h]e had run his car clear onto the desert right off the edge of the street''; he and the maid were with the man about five minutes. Renville left, was called back later in the afternoon, and went into Mrs. Fleming's mother's bedroom where there were several drawers pulled out.

The defense was an alibi. Mary Askew testified she was and had been for six or seven years a maid in a Baltimore, Maryland, hotel called the Knights of Columbus Building; defendant lived there; he had lived there during those years in room 612; she saw him practically every day; he paid her $8.00 a month for doing his laundry; he paid her on the first of the month except when the first fell on Sunday, when he paid her on the following Monday; he paid her for her work on December 1, 1952, in the hotel; she saw him during the week before, which was Thanksgiving week; she remembered this because he had brought his grandchildren to the hotel and that was the only time she saw them there.

Arthur V. Wise, who retired on April 1, 1954, as president of Warner & Company, a men's clothing firm in Baltimore, testified he had known defendant 25 or 30 years; he saw defendant in front of the store on the morning of November 29, 1952, when he gave defendant a claim receipt for a hat defendant wanted renovated; he filled out the receipt dated November 29, 1952, and gave it to defendant; the receipt is in evidence; he filled out the top part of the receipt, in evidence, at the same time and retained it in the store; defendant gave the receipt back to the store when he picked up the hat on February 5, 1953; he did not erase any part of the ''11/29'' in the date on the top part of the receipt; he went over the ''11/29'' when it was taken to court in March 1953 because it was light.

Michael Vittello, the owner of a Baltimore cab company, testified that one Armonda Porter worked for him as a driver in November and December 1952; on November 30, 1952, he received a telephone call from a man concerning a doll; the man claimed to have lost it in one of his cabs; a manifest, in evidence, filled out and turned in by driver Porter and required to be kept by law, covered Porter's trips on November

30, 1952; on November 30, 1952, he spoke to Porter when the latter signed off at 5:58 p. m.; the next day, December 1, 1952, between 9 and 9:30 in the morning defendant came into the office of the cab company in Baltimore to ask for the doll again; Porter came in while he and defendant were talking; the doll was lost; the manifest does not show, and no rule or regulation requires it to show, the names of passengers. Armonda Porter testified he filled out the manifest which showed his trips on November 30, 1952; he identified defendant as the passenger on the trip shown on line 31 of the manifest; it shows 4:23 p. m., November 30, 1952, from North and Charles (the location of the Park Plaza Hotel) to Madison and Cathedral in Baltimore for a fare of 45 cents; defendant told him he had a doll for a little girl and was in a hurry; the trip lasted 7 or 10 minutes; when he signed off that day his employer asked him about a doll but he could not find one in the cab; on Monday morning, December 1, 1952, at 9 or 9:30 he saw the owner and defendant at the garage and defendant inquired about the doll; he was in the garage because his cab was greased every Monday.

Robert Murphy, a graduate of Harvard, in 1952 president of the American Football Guild, and in off seasons associated with a food company in Baltimore, testified he had known defendant about two years and a half; he saw defendant late in the afternoon, about 4:30 to 5:30, on November 29, 1952, in the club bar of the Park Plaza Hotel in Baltimore; they were both watching the Southern California-Notre Dame football game on television; Edmund Fick and others were also present; also on the following day, Sunday, November 30, 1952, just before noon, he saw defendant in the main dining room of the Park Plaza; defendant, George Ross, Webster Griebel, Edmund Fick, and Colonel Cole were there having breakfast together; he saw defendant again the next day, Monday, December 1, 1952, at the Park Plaza; Colonel Cole was present; he (the witness) "arrived shortly after noon, and left shortly after 1:00 o'clock"; he fixed December 1, 1952, precisely because he had gone to the Park Plaza, had his luggage with him, had an appointment at the Hotel Pierre in New York at 6 o'clock that evening, and had to leave Baltimore shortly after 1 o'clock in order to get there driving, and because Colonel Cole made a quip about the "Fighting Irish"; he left defendant about 5 or 10 minutes past 1 on December 1, 1952.

George W. Ross, in the advertising business in Baltimore

since 1946, testified his office was in the Park Plaza Hotel in Baltimore; he had known defendant about 20 years; he saw defendant in the Park Plaza on Sunday, November 30, 1952, between 11:30 a. m. and 12 noon; Mr. Ross, Mr. Murphy, Mr. Fick and Colonel Cole were there; defendant came in, sat down, and joined them in a cup of coffee; he remembered the precise date because he had just moved from the city and had planned to stay at home over the Thanksgiving weekend but was required to spend Sunday working in the city; he has not worked on a Sunday since November 30, 1952.

John Channell, son of defendant, who resided in Easton, Maryland, and was formerly with the Maryland state police which he left because of physical disability, testified he saw defendant at the Knights of Columbus Building in Baltimore where defendant lived, the night of November 30, 1952; he recalled the date because it was the first Sunday after the 25th of November, on which date his former employer had an automobile accident; he went to Baltimore the following Sunday and saw his father; he and his father talked about the accident and about a misplaced doll which his father said he had bought for his (the witness's) youngest daughter; his father said he had a coat for his (the witness's) oldest daughter and he went upstairs and brought it down to him.

Edmund J. Fick, a roofing contractor, testified he saw defendant at the Park Plaza Hotel in Baltimore early in the day on November 29, 1952; he saw defendant again in the Park Plaza about 5 in the afternoon on November 29, 1952; he had been to an oyster roast that afternoon; it was the afternoon of the Army-Navy game and the Southern California-Notre Dame game at South Bend; when he returned to the Park Plaza about 5, the Southern California-Notre Dame game was on television in the club bar; defendant was there when he arrived; they watched the remainder of the game; defendant ate practically all his meals at the Park Plaza; he, also, had practically all his meals there and he saw defendant a lot of times at breakfast; he also saw defendant the next day, November 30, 1952, at the Plaza; he went to Mass at 11:30; it was over at 12:30; he then went to the Park Plaza, stopped in the Pub Room; defendant, Colonel Cole, Mr. Ross, Mr. Murphy, and Mr. Griebel were there; he left about 1:30 or 2; later he learned from the owner of the Park Plaza that defendant was in trouble, what it was, he realized the dates on which he had seen defendant, and he volunteered to testify.

In rebuttal a handwriting expert testified that on micro-

scopic examination of the top part of the receipt for the hat, testified to by Arthur Wise, which was the part retained by Mr. Wise, there appeared to have been an erasure where the figure "11" appears in the date "11/29"; the "11" and "29" had been traced over with pencil strokes; there was no indication of any erasure under the figures "29"; there were no erasures on the "11/29/52" on the lower part of the receipt, the part retained by defendant and returned to Mr. Wise when he picked up the hat. Defendant did not testify.

It was stipulated that no complaint, information, or indictment had ever been issued, signed, or returned in Palm Springs or Riverside County charging defendant with any offense arising out of or based on the incident testified to as having occurred at the home of Mrs. Fleming in Palm Springs on November 23, 1951; that any charge arising out of that alleged incident was required to have been filed in either the justice's court at Palm Springs or in the Superior Court in the County of Riverside; that the statute of limitations for the offense of burglary is three years and the statute does not run while a defendant is out of the state.

 Generally evidence of a separate and distinct offense is not admissible in proof of the one charged. Mr. Justice Spence, writing for the court in *People* v. *Westek,* 31 Cal.2d 469 [190 P.2d 9], said (p. 476):

"It is the general rule that evidence of other crimes, where it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, should be excluded because its probative value is outweighed by its prejudicial effect. (22 C.J.S., Criminal Law [1940], § 682, p. 1084; 8 Cal.Jur., Criminal Law [1922], § 167, p. 58; Wigmore on Evidence (3d ed.), vol. I, § 193, p. 642; § 194, p. 646.)"

An excellent statement of the rule is found in *People* v. *Sanders,* 114 Cal. 216 (p. 229 [46 P. 153]):

"[G]enerally speaking, evidence of a separate and distinct offense is not admissible in proof of the one charged. Thus, it will not be permitted generally to prove that a defendant committed some other, independent, and distinct crime from the one charged, as the basis of inference and argument that he may have committed the particular one for which he is on trial. For: 1. The defendant shall be charged with and tried for but one crime under a single indictment; 2. He may and probably will be unprepared to meet with evidence the offense undisclosed by the pleadings; and 3. There being no

logical connection between the two offenses, the first does not tend to elucidate or prove any material fact connected with the second, and does tend strongly to distract the minds of the jury from the issue which they are called upon to decide, and to subject the defendant to unjust suspicion and discredit. (*People* v. *Jones*, 32 Cal. 80.)''

■ The evidence of a separate and distinct offense must be directly relevant to the facts material to the offense charged, and such relevancy must be clearly apparent. Otherwise, such evidence must be excluded. *People* v. *Albertson*, 23 Cal.2d 550 [145 P.2d 7], reversed a conviction of murder because of the erroneous admission of evidence of an alleged prior assault by the defendant on the deceased a little more than a month before the alleged murder. ■ The court declared (p. 576):

''The general rule, universally recognized, is that in a criminal prosecution the defendant can be tried for no other offense than that which he is charged in the indictment or information; evidence of collateral independent crimes is not admissible [citations]. The equally well recognized exceptions to this rule are clearly defined. Evidence of other crimes may be admitted when it tends directly to establish the crime charged by proving a material fact, where it is part of the res gestae, or where it helps to disclose motive, intent, premeditation, guilty knowledge, malice, or a common plan or scheme [citations].

■ ''The trial court, however, should be guided by the rule that such proof is to be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt. [Citations.] The textwriter explains the limited application of the exceptions to the general rule in these words (Wharton's Criminal Evidence, sec. 360, p. 567): 'Certain conditions must always exist as a predicate to the admission of evidence of other crimes. Such evidence, being a departure from the general rule of exclusion, is only admitted to render more certain the ascertainment of the exact truth as to the charge under trial. In any loose relaxation of the rule, the danger to the accused is that evidence may be adduced of offenses that he has not yet been called upon to defend, of which, if fairly tried, he might be able to acquit himself.

" 'In the first place, the collateral offense for which an accused has not been tried tends to prove his inclination towards crime, that is, to render more probable his guilt of the charge under trial, which is an absolute violation of the rule. It does not reflect in any degree upon the intelligence, integrity, or the honesty of purpose of the juror that matters of a prejudicial character find a permanent lodgment in his mind, which will, inadvertently and unconsciously, enter into and affect his verdict. The juror does not possess that trained and disciplined mind which enables him either closely or judicially to discriminate between that which he is permitted to consider and that which he is not. Because of this lack of training, he is unable to draw conclusions entirely uninfluenced by the irrelevant prejudicial matters within his knowledge. . . .

" 'A man may fully recover from the effects of judicial tribulation where it affects only his property or material interests. But recovery from the effects of a charge that involves his reputation and character, and that threatens his liberty or his life, is a recovery only in name. Absolute acquittal cannot completely restore him to the place he once held. The stain of prosecution cannot be eradicated. These momentous consequences demand a rigorous enforcement of the rule, in criminal charges, that evidence of the collateral offense must never be admitted, unless it can be applied to more certainly demonstrate the truth. Hence: (a) Ground must first be laid implicating the accused in the charge under trial, and unless sufficient evidence of this has been, in the opinion of the trial judge, first adduced, all evidence of other offenses must be excluded; (b) the collateral offense cannot be put in evidence without proof that the accused was concerned in its commission; (c) there must be identity of person or crime, scienter, intent, system, or some integral parts of the exceptions established between the charge under trial and that sought to be introduced, that clearly connects the accused, showing that the person who committed the one crime must have committed the other. In other words, some connection between the other crime and the crime charged must be shown, and it must be shown with reasonable certainty that the accused committed the other crime.' "

In *People* v. *Lane*, 100 Cal. 379 [34 P. 856], it was held that evidence of a distinct, substantive offense cannot be received unless there is some clear connection between that offense and the offense charged from which it may be logically

inferred that if guilty of one he must be guilty of the other. (See also *People* v. *Newson*, 37 Cal.2d 34 [230 P.2d 618]; *People* v. *Shaw*, 17 Cal.2d 778, 810 [112 P.2d 241]; *People* v. *Ranney*, 213 Cal. 70, 75 [1 P.2d 423]; *People* v. *Canfield*, 173 Cal. 309 [159 P. 1046]; *People* v. *Glass*, 158 Cal. 650 [112 P. 281]; *People* v. *Wright*, 144 Cal. 161 [77 P. 877]; *People* v. *Hurley*, 126 Cal. 351 [58 P. 814]; *People* v. *Gilliland*, 39 Cal. App.2d 250 [103 P.2d 179]; *Larson* v. *Larsen*, 72 Cal.App. 169 [236 P. 979].)

█ Tested by these rules, it is patent the court erred in admitting the evidence with respect to the Palm Springs incident. That incident long antedated any of the occurrences properly embraced within the charge of burglary of the Newman home. It was not a part of the *res gestae*. It was an independent and distinct offense. It did not elucidate or prove any material fact connected with the Pacific Palisades incident. There was nothing about the Palm Springs occurrences that clearly connected defendant with the offense charged. There was no clear connection between the two offenses from which it may be logically inferred that if defendant was guilty of one he must be guilty of the other. The connection of the Palm Springs incident with that charged is not clearly perceived and the doubt should have been resolved in favor of the accused. █ As said in *People* v. *Albertson, supra,* 23 Cal.2d 550, evidence of a collateral offense is not admissible because it might tend to prove an accused's inclination towards crime.

It is argued that the evidence was admissible to show the intent of defendant. █ Evidence of other offenses should be admitted for the purpose of showing intent only when the intent accompanying the act is equivocal, or where it is claimed by the defendant that the act was the result of mistake, accident, or inadvertence, or where intent is otherwise denied. (*People* v. *Glass, 158 Cal. 650, 656* [112 P. 281]; *People* v. *Byrnes*, 27 Cal.App. 79, 84 [148 P. 944]; *People* v. *Washburn*, 104 Cal.App. 662, 667-668 [286 P. 711]; 18 Cal. Jur.2d 588, § 138.) █ The evidence relative to the Palm Springs incident did not in any way negative the intent with respect to the Pacific Palisades entry as being of any other kind than to commit theft. The intent of the intruder into the Newman home was not equivocal.[1] The proof of that offense

---

[1]Notwithstanding the fact that the intent of the intruder into the Newman home was unequivocal, the court instructed the jury that the evidence with respect to the Palm Springs incident was offered for the purpose, among others, of establishing intent.

carried with it obvious and conclusive implication of guilty intent. There was never any doubt, never any question, never any suggestion from any source whatsoever but that if the offense charged was committed it was committed with the sole intent to commit theft. Proof of the Palm Springs incident was not admissible to establish the intent of the intruder into the Newman home.

It is also argued that the evidence as to the Palm Springs incident was admissible to prove a common plan or scheme. The mere fact that both intrusions were made during daylight in private dwellings, that drawers were opened and nothing taken, and that the intruder drove away in an automobile—the only similarities between the two incidents—are not enough to show a general plan or scheme. To be admissible the evidence of other offenses must tend to show that the offense for which the defendant is being tried is part of a general plan or system of criminal acts; they must be part of a chain and in consequence so linked as to be necessarily connected with the system or general plan. (*People* v. *Eppstein*, 108 Cal.App. 72, 76 [290 P. 1054]; *People* v. *Daniels*, 85 Cal.App.2d 182, 191 [192 P.2d 788].) Wharton states that "to be admissible as relevant under system, the collateral, extraneous, or independent offense must be one that forms a link in the chain of circumstances and is directly connected with the charge on trial." (1 Wharton, Criminal Evidence, 147, § 39.)[2] Wigmore says there must be

---

[2]Wharton quotes from *People* v. *Molineux*, 168 N.Y. 264 [61 N.E. 286, 62 L.R.A. 193], in part as follows: "As to a common plan or scheme: It sometimes happens that two or more crimes are committed by the same person in pursuance of a single design, or under circumstances which render it impossible to prove one without proving all. To bring a case within this exception to the general rule which excludes proof of extraneous crimes, there must be evidence of system between the offense on trial and the one sought to be introduced. They must be connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both. Underhill, in his work on Criminal Evidence (§ 88), thus states this exception to the general rule: 'No separate and isolated crime can be given in evidence. In order that one crime may be relevant as evidence of another, the two must be connected as parts of a general and composite scheme or plan. . . . Some connection between the crimes must be shown to have existed in fact and in the mind of the actor, uniting them for the accomplishment of a common purpose, before such evidence can be received. This connection must clearly appear from the evidence. Whether any connection exists is a judicial question. If the court does not clearly perceive it, the accused should be given the benefit of the doubt, and the evidence should be rejected. The minds of the jurors must not be poisoned and prejudiced . . . by receiving evidence of this irrelevant and dangerous description.' " (1 Wharton, Criminal Evidence, 84, § 31.)

*"such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations. . . .* [W]here the very act is the object of proof, and is desired to be inferred from a plan or system, the combination of common features that will suggest a common plan as their explanation involves so much higher a grade of similarity as to constitute a substantially new and distinct test [from that of negativing innocent intent]." (II Wigmore on Evidence, 202, § 304.)[3]

There were many dissimilarities between the two intrusions. At Pacific Palisades: occurred in December 1952 in Los Angeles; the intruder was cool, calm, and composed; he was in Mrs. Newman's presence only long enough to have a very brief conversation; he parked his car for a quick getaway; he departed surreptitiously and as quickly as he could after Mrs. Newman left the room. At Palm Springs: occurred in November 1951, a year before the Pacific Palisades incident, and 100 miles from Los Angeles; the intruder was nervous, trembling, and could not write; he held a conversation with the maid; then when the doorbell rang and the maid started for the back door, instead of taking flight he followed the maid to the kitchen, waited there until she had gone from there through the service porch and returned to the kitchen and then to the dining room with a third person; he then held a lengthy conversation with the maid and the other person,

---

[3]Wigmore elaborates: "When the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's Design or Plan to do it (*ante,* § 102). This in turn may be evidenced by conduct of sundry sorts (*ante,* § 234) as well as by direct assertions of the design (*post,* § 1725). But where the conduct offered consists merely in the doing of other similar acts, it is obvious that something more is required than that mere similarity, which suffices for evidencing Intent (*ante,* § 302). The object here is not merely to negative an innocent intent at the time of the act charged, but to prove a pre-existing design, system, plan, or scheme, directed forwards to the doing of that act. In the former case (of Intent) the attempt is merely to negative the innocent state of mind at the time of the act charged; in the present case the effort is to establish a definite prior design or system which included the doing of the act charged as a part of its consummation. In the former case, the result is to give a complexion to a conceded act, and ends with that; in the present case, the result is to show (by probability) a precedent design which in its turn is to evidence (by probability) the doing of the act designed.

"[P. 204.] It will be seen that the difference between requiring *similarity,* for acts negativing innocent Intent, and requiring *common features indicating common design,* for acts showing Design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity." (II Wigmore on Evidence, 202, § 304.)

wrote his name and part of his address on a slip of paper, gave it to the maid, and departed; he was there about 15 minutes; he left unhurriedly while they were still in the room and went, still unhurriedly, to the car; he parked his car so that his getaway was awkward and impaired.

One of the glaring omissions in the evidence with respect to the Palm Springs incident is the fact that although finger-print impressions, the strongest evidence of identity of a person (*People* v. *Adamson,* 27 Cal.2d 478, 495 [165 P.2d 3] ), were taken by the police in the Fleming home, and the piece of paper on which the intruder wrote his name and part of his address had been turned over to the police, no evidence was introduced with regard to them and no explanation offered by the prosecution for its failure to produce evidence with respect to them.

A very close case is presented. Identification of the intruder into the Newman home depends on the testimony of a single witness. Her testimony is punctured with inconsistencies, contradictions, and discrepancies. The testimony of the People's witness from the Cadillac service agency was that defendant's car was in the agency being serviced at the time the alleged burglary took place. There was no evidence that defendant owned a car registered in Maryland with license No. 254-882. The testimony in support of the alibi was unusually strong and impressive. The evidence relative to the Palm Springs incident must have operated with telling effect on the jury. Its inflammatory consequences are quite apparent. Indeed, defendant was in effect tried for burglary of the Fleming home as well as for the alleged offense charged in the information—burglary of the Newman home. The district attorney in his closing argument to the jury said: "The question involved in this particular case is, was this defendant in the home of Mrs. Fleming? That's the question." Again: "Was he in the [Fleming] home; that is the question." The inflammatory effect of the Palm Springs evidence was further greatly aggravated and magnified by provocative, devastating comments by the district attorney on the failure of defendant to deny that incident, repeated time and time again in his argument to the jury.

The district attorney not only commented vigorously on the failure of defendant to testify, but argued that such failure to testify was proof of the falsity of the defense. The Constitution says that defendant's "failure to explain or to deny by his testimony any evidence or facts in the case *against*

116

him may be commented upon by the court and by counsel, and may be considered by the court or the jury.'' (Const., art. I, § 13. Italics added.) ▮▮▮ 'A defendant's silence cannot be regarded as a confession; nor does it ''create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny.'' (*People* v. *Adamson*, 27 Cal.2d 478, 490 [165 P.2d 3].) Had defendant taken the stand, the commission of the admitted prior convictions could have been revealed to the jury on cross-examination to impeach his testimony. This is a plausible explanation of his failure to take the stand to deny or explain evidence against him. In Adamson it is stated (p. 494):

''There has been much criticism of the present state of the law, which places a defendant who has been convicted of prior crimes in the dilemma of having to choose between not taking the stand to explain or deny the evidence against him thereby risking unfavorable inferences, and taking the stand and having his prior crimes disclosed to the jury on cross-examination. (See 22 Cornell L.Q. 392, 395; 31 Mich.L.Rev. 40; 9 Proc.Am.L.Inst., *supra* [202, 204, 207]; 56 Reports of A.B.A., *supra* [137, 142, 144].) In the present case defendant admitted two prior felony convictions for which he served terms of imprisonment in the Missouri state prison. The fact of the commission of these crimes was not offered or introduced into evidence and would have been inadmissible under the general rule with respect to prior crimes. (*People* v. *Albertson*, 23 Cal.2d 550, 576 [145 P.2d 7], and authorities there cited.) Had defendant taken the stand, however, the commission of these crimes could have been revealed to the jury on cross-examination to impeach his testimony. (Code Civ. Proc., § 2051; *People* v. *Braun*, 14 Cal.2d 1 [92 P.2d 402]; see 28 Cal.L.Rev. 222; 3 Wigmore, *supra*, 380.) Since fear of this result is a plausible explanation of his failure to take the stand to deny or explain evidence against him (see 22 Cornell L.Q. 392; 13 Jour. of Crim. Law and Criminology, 292, 295; 9 Proc.Am.L.Inst., *supra*; 56 Reports of A.B.A., *supra*), the inference of the credibility and unfavorable tenor of such evidence that arises from this failure is definitely weakened by this rule of impeachment. This weakness, however, could not be revealed to the jury by counsel or court without prejudicing the defendant through the revelation of past crimes.''

(See also *People* v. *Robarge*, 111 Cal.App.2d 87, 96 [244 P.2d 407].) ▮▮▮ While a district attorney may comment

on a defendant's failure to deny or explain evidence *against* him, in this case he crossed the borderline of permissible argument in arguing to the jury that defendant's failure to testify was proof of the falsity of the alibi (*People* v. *Adamson, supra,* 27 Cal.2d 478, 495), and although the argument was not objected to, it is a matter of vital importance in considering the prejudicial effect of the improperly admitted evidence.

 The improper evidence with respect to the Palm Springs incident, together with the argument of the district attorney concerning it, well may have been the deciding factors which brought about defendant's conviction. The error in admitting the evidence materially affected the substantial rights of defendant, was highly prejudicial, and resulted in a miscarriage of justice entitling him to a reversal. (*People* v. *Wetherford,* 27 Cal.2d 401, 403, 420 [164 P.2d 753] ; *People* v. *Newson,* 37 Cal.2d 34, 46 [230 P.2d 618] ; *People* v. *Kirkes,* 39 Cal.2d 719, 727 [249 P.2d 1] ; *People* v. *Robarge,* 111 Cal.App.2d 87, 97 [244 P.2d 407] ; *People* v. *Talle,* 111 Cal.App.2d 650, 679 [245 P.2d 633].)

In view of our conclusion, it is not necessary to reach defendant's other assignments of error.

The judgment and the order denying a new trial are reversed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied October 25, 1955, and respondent's petition for a hearing by the Supreme Court was denied November 9, 1955. Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.