[Civ. No. 5393.   Fourth Dist.   Apr. 17, 1957.]

PEARL LUCILLE VISE et al., Respondents, v. ELMER S. ROSSI, Appellant.

Morris B. Chain and Manley C. Davidson for Appellant.

Baker, Palmer, Wall & Raymond for Respondents.

GRIFFIN, J.—Action for both actual and punitive damages for an assault and battery alleged to have been committed by appellant Elmer S. Rossi (hereinafter referred to as defendant) on Pearl Vise, respondent (hereinafter re-

ferred to as plaintiff) at her home in Bakersfield. Plaintiff's husband also sought claimed expenses for medical and hospital expenses. A jury verdict was rendered in favor of plaintiff for $6,000 compensatory damages and $7,500 exemplary damages, as well as $1,500 to plaintiff's husband for medical and hospital expenses. This latter sum was, by consent, reduced by the trial court, on a motion for new trial, to the sum of $919. Defendant appeals from the judgment and order denying a new trial. This last order is not appealable and should be dismissed. The questions raised thereunder will be reviewed on the appeal from the judgment.

A résumé of the facts shows that defendant married plaintiff's sister in February, 1955. Plaintiff and her husband had been married for a number of years. Plaintiff had had five rather serious operations and was in delicate health. Defendant and his wife had a somewhat "stormy marital relationship" and on many occasions defendant's wife, Nellie, returned to plaintiff's home for various periods, claiming that defendant had inflicted grievous bodily injury upon her. However, defendant and plaintiff were on good terms and they endeavored not to interfere with Nellie's problems. Defendant was a prosperous farmer. His wife was employed in a tavern. According to plaintiff's story, on August 31, 1955, defendant came to plaintiff's home and demanded a dress belonging to Nellie, which defendant had purchased for her. Nellie had expressed some dislike for it. While defendant was at plaintiff's home Nellie called plaintiff on the telephone and told her not to give the dress to him because she thought he was going to destroy it as well as other clothes she left there. Pearl endeavored to pacify defendant and told him to leave the premises. He refused and a struggle ensued at the door of the bedroom where Nellie had been sleeping the night before. She claimed defendant twisted her arms, her body, and "kneed" her in the region of her stomach and left side, and as a result fractured two ribs and caused two hernias in the previous incision resulting from her operations. She crawled to the telephone, called her husband, and told him of the claimed attack. Defendant, knowing the husband, talked to him and claimed he never bothered her in any manner. The husband told him to leave and he did so. The police were called and plaintiff was later taken to the doctor's office and then to a hospital. X-rays were taken of her ribs and the associate radiologist's report

showed that the eighth and ninth ribs were fractured. These X-rays were not produced as evidence in the case.

Defendant's story was somewhat different. He presented a milder picture of the affray and claimed that plaintiff was entertaining a man who was a stranger to him, in her home. Plaintiff's doctor (Hong) testified he examined the X-rays and noticed the broken ribs indicated, but did not see any abrasions, bruises or trauma on plaintiff's body indicating a blow to her ribs or body; that he did not see welts or red marks on her arms, or any symptoms that would indicate hernia, although plaintiff did complain of pain in that region. Subsequently, on March 4, 1956, he operated for two hernias and testified that in his opinion these hernias were caused by a subsequent blow or external force. There was medical testimony that these hernias, appearing at the time they did appear, could have been the result of previous faulty suturing of the incisions or may have been caused by some internal strain. It does appear that at the time of trial, in June, 1956, there was a complete healing and recovery and plaintiff felt better than she had for years.

On the motion for new trial it was shown by affidavit of defendant's medical witness, who was duly qualified and testified at the trial, that since the verdict he studied and examined the X-rays about which plaintiff's doctors testified, and did not find the existence of any fractures whatsoever of the eighth and ninth ribs; that by utilizing an intense spotlight, no fractures could be observed but there was a "questionable" line on the ninth rib which was presumably an incomplete fracture, a negligible type of injury; that the radiologist was called in and he examined the films with him and stated he could find no fracture of the eighth rib but would call the line on the ninth rib a fracture which was negligible; that the former report was made by his associate and they all erroneously assumed it was correct. Argument was made that if a true report of plaintiff's condition had been before the jury the amount of the award would have been much less. The court denied the motion for new trial on the ground of newly discovered evidence, indicating that since the report showed a fracture of only one rib, rather than two, there would be no consequential difference in the damage sufficient to grant a new trial. There may be some room for a reasonable difference of opinion in this respect. It does appear that the doctors, as well as counsel for the respective parties, believed the report reflected the

true situation and did have reason to rely upon it. The testimony of the several doctors, based upon the former report as to the extent and effect of the claimed blows to plaintiff's side, may well have been different and the granting of a new trial, for this reason alone, would have been justified. However, this same doctor, in testifying for defendant, said he took X-ray pictures of plaintiff's eighth and ninth ribs about the time of trial, and he found no evidence that either rib had ever been fractured in August, 1955, or at any other time. This report was corroborated by one other doctor. Assuming this doctor and defendant's counsel had knowledge of this fact prior to trial, it might well appear that these X-rays were available to them and could have been produced at the trial. This delay and lack of diligence, in itself, and standing alone, might justify the denial of the motion on that ground. (*Brooks* v. *Lyon,* 3 Cal. 113; 20 Cal.Jur. p. 183, § 120.) However, a more serious question, raised by defendant on the motion for new trial and on appeal, involves the reception in evidence, over limited objection, of certain evidence of other batteries and wrongful acts committed by defendant against his wife, sister of plaintiff. Defendant's counsel claims this was done for the obvious purpose of influencing the jury to prejudice it against defendant, to degrade him, to show his inclination to commit the battery charge, and to cast reflection upon his character and morality as one more likely to have committed such a battery.

In the opening statement of counsel for plaintiff, after stating the facts of the claimed battery, he said that the married life of defendant and his wife had been a tempestuous one and quarrelsome; that plaintiff knew of defendant's propensity to destroy and had seen it before. Plaintiff then called the defendant as her first witness under section 2055 of the Code of Civil Procedure and immediately propounded the question: ''On several occasions and before August 31, 1955, Mrs. Vise had called the police as a result of the battles between you and your wife, did she not? MR. CHAIN: If Your Honor please, I submit that is irrelevant. . . . If that is within the scope of the testimony I have no objection, but I didn't want to bring in a different action in this action.'' The objection was overruled and he answered ''Yes.'' Thereafter he was questioned as to his conversation with plaintiff's husband, when he was accused of beating plaintiff, as follows:

''Q. (By plaintiff's counsel): And will you tell the jury

what you said to him when you called him on that occasion? A. I said, . . . Lester, I weigh 200 pounds, you expect me to beat up a woman that's been hurt four or five times. I never touched that woman . . .

"Q. You told him that you weighed how much? A. Around 200 pounds.

"Q. That you wouldn't do anything like that? A. No."

Objection was made to this general line of questioning and the court answered: ". . . in the light of the answer the witness has previously given I'll overrule the objection." Apparently the court relied upon the question and answer as opening up the entire field and permitting the plaintiff to prove all of these claimed beatings of defendant's wife, on the theory that defendant said he would not do anything like that to anyone. Considerable evidence was thereafter produced, in detail, showing such treatment. As we construe the questions and answers the court erred in such a construction. The first statement referred to plaintiff and to no other person. Defendant knew plaintiff had been operated on four or five times. Defendant's wife did not fall in this class. It is apparent he was denying any act of violence towards plaintiff. The second question related to defendant telling plaintiff's husband he weighed around 200 pounds. Plaintiff's counsel asked, in effect, if he did not tell him that he wouldn't do anything like that, and the answer was "No" he did not tell him that. It is plain, therefore, that this answer did not open up the entire question of defendant's previous treatment of his own wife, and could not be construed to constitute a statement by defendant that he had never committed a battery upon anyone other than plaintiff. Therefore, evidence of other batteries on defendant's wife was not admissible for the purpose of impeachment. An example of the testimony of other batteries committed by defendant on his wife is shown by the following, which related to a claimed battery on defendant's wife subsequent to the claimed battery he committed on plaintiff:

"(By Counsel for plaintiff): Q. Have you seen the results of these other acts on your sister? A. Yes, sir, Mr. Raymond, I got home from the hospital the 13th of March and on the 15th of March he beat Mrs. Rossi, my sister considerable. She came over with blood on her face and big knot on her head, and she was crying, he and another policeman showed her in the door and left. Q. That was at your home? A. Yes, sir. MR. CHAIN: If your Honor please, I move that her answer be

stricken as no foundation being laid, that she ever saw him strike her at that time, that is her conclusion. A. He admitted it, Mr. Chain. THE COURT: The motion to strike the previous answer may go out." The previous answer was "Yes, sir."

Whether the jury understood the motion and ruling was to strike all the questions and answers bearing on this subject is problematical. Even if stricken, it did have a damaging effect and this, together with the other inadmissible evidence of other batteries on defendant's wife may well have accounted for the rather generous actual as well as punitive damages rendered by the jury's verdict.

In *Larson* v. *Larson*, 72 Cal.App. 169 [236 P. 979], defendant was sued for assault and battery for shooting plaintiff with a shotgun. The defendant denied the shooting and, over objection of defendant, the trial court permitted testimony that defendant had shot at other boys on previous occasions. The court held that such evidence was inadmissible either to show a disposition on the part of defendant to commit such offense or as corroborative of the testimony directed to the truth of the specific offense for which he was on trial, and held that this testimony was highly prejudicial to the defendant, requiring a reversal. (See also *People* v. *Channell*, 136 Cal.App.2d 99 [288 P.2d 326]; and 18 Cal.Jur.2d p. 583, § 136, and p. 610, § 155.)

Considering this error, together with the showing made as to newly discovered evidence, it appears to us that a new trial should be had.

The attempted appeal from the order denying a new trial is dismissed. Judgment reversed.

Barnard, P. J., and Mussell, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 12, 1957. Shenk, J., and Carter, J., were of the opinion that the petition should be granted.