Filed 5/3/13  Zamora v. Palitz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANABELLA SOFIA ZAMORA, a Minor, etc., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> HARVEY F. PALITZ, <br><br> Defendant and Respondent. | F062898 <br><br> (Super. Ct. No. 376698) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  William A. Mayhew, Judge.

Law Offices of Ian Herzog, Ian Herzog, Sandra Tyson, and Evan D. Marshall, for Plaintiffs and Appellants.

Galloway, Lucchese, Everson & Picchi, Karen A. Sparks, David R. Lucchese, and Patricia A. Timm, for Defendant and Respondent.

-ooOoo-

This appeal follows a judgment on a special jury verdict in a medical malpractice action brought on behalf of twins who were born prematurely, Anabella and Christian Zamora (appellants).  Although the jury found that respondent Harvey F. Palitz, M.D.,

was negligent in treating the twins' mother, Christina Zamora, it found his negligence was not a substantial factor in causing harm to the twins.

Appellants contend that the trial court abused its discretion before trial by denying them leave to augment their expert witness list to include a pathologist to address the issue of identification of placental tissue samples. They argue that they were surprised, through no fault of their own, by the deposition testimony of a defense expert pathologist and, therefore, they should have been allowed to add an expert pathologist, although the deadline for disclosing expert witnesses had passed.

We conclude the trial court did not abuse its discretion and, further, appellants have not demonstrated prejudice. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORIES

### Birth of the twins

In August 2004, Christina and her husband Mark Zamora learned that Christina was pregnant. Christina was diabetic and was expecting twins, and for these reasons, her pregnancy was considered high risk. High-risk pregnancies pose a higher risk of an adverse outcome, including premature birth. Christina engaged obstetrician and gynecologist Palitz to manage Christina's care and deliver the twins. Perinatologist Subhash Mitra also consulted on the pregnancy. Christina had a relatively uneventful pregnancy until January 2005, and the babies were developing normally.

Around 6:00 p.m. on January 6, 2005, Christina noticed a pinkish discharge and became concerned. She telephoned Dr. Palitz, and he told her to keep her previously scheduled appointment with Dr. Mitra the next morning. Around 9:00 p.m., Christina began feeling tingling sensations in addition to the spotting. At midnight, she started feeling cramping sensations, and Christina and Mark decided to go to the emergency room.

They arrived at the hospital shortly before 1:00 a.m. on January 7, 2005, and were taken to the labor and delivery section of the hospital. Christina was having uterine

2.

contractions about three to four minutes apart. A nurse spoke to Dr. Palitz by telephone and described Christina's status. Dr. Palitz ordered terbutaline to stop the contractions and a fetal fibronectin test. A positive fetal fibronectin test would indicate a high risk of preterm labor. The nurse administered the fetal fibronectin test and observed that Christina's cervix was closed. At 3:30 a.m., the nurse noted that Christina continued to complain of uterine contractions four to five minutes apart. Around 3:50 a.m., the nurse talked to Dr. Palitz again and he ordered nifedipine, another drug intended to stop the contractions.[1] Christina was told she could go home in 30 minutes. Christina and Mark left the hospital around 4:30 a.m. Christina continued to have contractions at home and was unable to sleep.

That morning, Mark drove Christina to her 9:30 a.m. appointment with Dr. Mitra. At the doctor's office, Christina's pain became worse. Mark explained that they had been to the hospital and had a test to determine if Christina was in labor (the fetal fibronectin test). An assistant went to look up the test results and returned with Dr. Mitra. He told Christina and Mark that the fetal fibronectin test was positive and Christina would be transferred to the hospital.

Initially, Dr. Mitra told Christina and Mark he was going to try to stop the contractions. Christina was given steroids to help the babies' lungs, magnesium sulfate, which is a tocolytic, and antibiotics. Subsequently, however, Dr. Mitra observed that Christina's cervix was dilated five or six centimeters, and he told Christina the babies would have to be delivered. Anabella was delivered vaginally. Christian was transverse and was delivered by caesarean section a few minutes later. The babies were taken to the neonatal intensive care unit. Each baby weighed about one and a half pounds. Anabella weighed 680 grams and Christian weighed 650 grams.

---

[1]Medications used to stop uterine contractions in order to stop or delay preterm labor are called tocolytics. Terbutaline and nifedipine are both tocolytics.

Following the birth of the twins, hospital staff set aside the placentas, which were labeled "Twin A," corresponding to the firstborn twin, Anabella, and "Twin B," for the second twin, Christian. The placentas were sent to the hospital's pathology laboratory, and hospital pathologist Robert Purvis, Jr., examined .

the placental slides.[2] For Twin A, he observed "a moderate infiltrate of neutrophils primarily within the chorion but also within the amnion," "some syncytial knots," and "acute inflammatory infiltrate extend[ing] over the fetal surface of the disk." For twin B, he observed "moderate infiltrate of neutrophils within the walls of the vessels [of the umbilical cord]," "a marked infiltrate of neutrophils with some necrosis," and "some syncytial knots."

Dr. Purvis diagnosed "[m]oderate acute chorioamnionitis and meconium staining" of Twin A's placenta and "[m]oderate acute funisitis and marked acute chorioamnionitis" of Twin B's placenta. Chorioamnionitis is an infection of the fetal membranes involving the chorion, which is the outer amniotic membrane and is part of the placenta, and the amnion, which is the inner membrane. Funisitis is inflammation of the umbilical cord.

Within a few weeks of their birth, the twins were moved to Lucile Packard Children's Hospital in Palo Alto. When Anabella was seven days old, she had a bowel perforation and went into cardiac arrest; as a result, she had a very low level of oxygen for a prolonged time. Anabella stayed at the children's hospital for six months and Christian stayed for four months. After Anabella was discharged from the hospital, she used an oxygen concentrator 24 hours per day. She was also fed through a gastric feeding tube and was connected to a feeding pump at night. Anabella remained on oxygen for a year and a half and had a feeding tube for over five years. Christian did not require an oxygen concentrator or any medical apparatus after he left the children's hospital.

---

[2]Tissue samples from the placentas were preserved in paraffin blocks. The placental slides are very thin slices cut from the blocks and placed on glass slides for examination under a microscope.

In 2011, both twins were attending kindergarten. Anabella was not at grade level in reading or math, and her teacher was unsure whether she should be promoted to first grade. Christian was doing much better in school than Anabella, and his teacher believed he would have an easier time progressing to first grade. Also in 2011, Anabella scored in the fifth percentile in a test of language development, meaning that 95 percent of children her age would be expected to outperform her on the test. Christian was at or above age level in all areas of speech and language.

### Pretrial motions to add expert witnesses

This case began on December 12, 2005, when the Zamora family—Mark, Christina, and the twins (the Zamoras)—filed a complaint against Dr. Palitz and Doctors Medical Center-Modesto, Inc., the hospital where Christina went to the emergency room and later gave birth. The Zamoras alleged claims of medical malpractice and negligent infliction of mental distress. In 2009, the trial court granted summary judgment for the defendants with respect to Mark's claim, and we affirmed. (*Zamora v. Palitz* (Aug. 17, 2009, F056160) [nonpub. opn.].) Christina dismissed her claims in 2011 in exchange for a waiver of costs, and the hospital reached a settlement with the plaintiffs prior to trial. The trial proceeded on Anabella and Christian's claims against Dr. Palitz, and this appeal relates to the twins' claims against the doctor only.

The Zamoras' theory of the case was that Dr. Palitz committed medical malpractice by failing to admit Christina to the hospital when she was at the emergency room with contractions. They alleged that he should have "personally examined her or turned her over to a competent specialist and institute[d] prophylactic measures to delay and manage the onset of labor and otherwise taken necessary action to improve the babies' chances and improve fetal outcome." They claimed that Dr. Palitz's acts and omissions caused injury to Anabella and Christian because "many of the complications

that occurred to the twins could have been prevented or minimized by proper responsive care."[3]

By early 2007, the Zamoras were aware that the defendants disputed the claim that their conduct caused injury to the twins. In February 2007, the Zamoras propounded special interrogatories to the hospital asking if it contended that Christina had experienced any infection before the birth of the twins that accounted for the early onset of labor and delivery. The hospital responded, "The placental pathology report [by Dr. Purvis], dated January 7, 2005, indicates that there was chorioamnionitis and funisitis." In May 2007, the Zamoras requested from the hospital "any and all pathological specimens, slides, photographs or written reports pertaining to the labor and delivery" of the twins. In July 2007, the hospital sent the Zamoras' counsel six re-cut placental slides.

Three years after the complaint was filed, the parties exchanged expert witness lists on December 8, 2008, the date set for the exchange. Dr. Palitz disclosed a list of 15 retained experts. Among the experts listed were two pathologists, including Harvey Kliman. Dr. Kliman's address was at Yale University School of Medicine in the Reproductive and Placental Research Unit of the Department of Obstetrics and Gynecology. According to an attached attorney declaration, he was board certified in anatomic and clinical pathology and would provide testimony "regarding the fetal fibronectin test, causation and damages." The hospital's expert witness list included the same two pathologists. The Zamoras did not include a pathologist in their expert witness list.

Three and a half months after the parties exchanged expert witness lists, on April 16, 2009, the Zamoras filed a motion seeking, (1) to limit the number of expert witnesses designated by the defendants, and (2) to augment the Zamoras' expert witness

---

[3]These quotes are taken from the Zamoras' verified response to the hospital's first set of special interrogatories. This response was dated May 5, 2006.

list.  The Zamoras sought to add a forensic pathologist, Marvin Pietruszka, to their expert list.  The motion did not describe Dr. Pietruszka's proposed testimony, but a supporting declaration by the Zamoras' counsel stated that the doctor "will provide expert testimony concerning the causation and damages issues related to the placental slides, the fetal fibronectin test and, potentially other issues within his expertise."

The Zamoras cited Code of Civil Procedure section 2034.620 for the court's authority to allow a party to augment his or her expert witness list after the time for disclosing experts has passed.[4]  In their motion, the Zamoras argued that augmentation would cause no prejudice to the defendants, but they did not attempt to explain why they had failed to identify Dr. Pietruszka in a timely manner.

The defendants opposed the motion.  The hospital pointed out that the Zamoras' counsel had specifically requested pathology slides in 2007, and the only purpose of requesting the slides would have been to have an expert pathologist review those slides. The hospital argued that the Zamoras' counsel had been aware of the need for a pathologist for more than a year before their tardy request to augment their witness list, and they offered no explanation for their tardiness.

In addition, the hospital opposed the Zamoras' request to limit the number of expert witnesses.  In defending its disclosure of "several experts related to issues of causation," the hospital asserted:  "[T]he placental pathology in this case demonstrates that CHRISTINA ZAMORA had an amniotic infection that had reached both babies while still in utero.…  [E]xperts in different specialties and subspecialties are required to testify regarding the role of infection in this matter."

The trial court heard argument on the Zamora's motion on April 30, 2009.  With respect to the request for leave to augment the witness list, the Zamoras' counsel argued

[4]Subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.

7.

that he failed to designate a pathologist as the result of mistake. He told the court: "Maybe looking with 20/20 hindsight, I should have designated a forensic pathologist in view of what I can now see is the defense raising the specter of this chorioamnionitis and this infection from the placenta. [¶] And the 2034 augmentation procedures certainly contemplate lawyers making mistakes." The Zamoras' counsel explained why the Zamoras needed an expert pathologist:

> "[I]t turns out, if you deny me this expert, I cannot meet a very critical defense issue which has to do with the chorioamnionitis found in the placenta. Because it turns out, looking at it 20/20 hindsight, it takes a forensic pathologist to confront it the way that now I can see in the papers that they are going to present the issue. [¶] … I wish I was more perfect, but I'm human. And I'm taking a look at this thing, and I said, whoops, I can now see where they're coming from. I need this expert."

Dr. Palitz's counsel pointed out that the Zamoras' moving papers did not mention mistake or excusable neglect, observing, "It's not until today that we hear this."

The trial court denied the motion. As to the Zamoras' request for leave to augment the expert witness list, the court explained:

> "[T]he moving papers are just totally insufficient. I have to make findings under 2034.620(c) in order to grant that off of the moving papers. There is nothing, nothing, in the moving papers that have anything to do with the findings I would have to make, and, therefore, I cannot make them .…"

Addressing the Zamoras' counsel, the court continued, "[Y]ou cannot make up for that in oral argument." The Zamoras' counsel asked for leave from the court to "cure [his] mistakes with regard to the moving papers and the augmentation," and the court responded that it did not "rule on anything like that in advance."

Seven months after the court denied the Zamoras' request to augment their expert witness list, on December 15, 2009, their counsel filed a motion for leave to designate an additional expert witness. In the motion, the Zamoras asked to designate pathologist Arturo Mendoza as an expert witness. The Zamoras' counsel indicated that Dr. Mendoza would provide expert testimony concerning "the placental pathology, related laboratory

studies, and related issues, [and] causation." The Zamoras had also asked for leave to add an expert in the field of neuroradiology.

In support of their motion, the Zamoras asserted that the deposition of Dr. Kliman revealed "new issues not previously raised in this litigation …." The Zamoras' counsel took Dr. Kliman's deposition on September 9, 2009. Dr. Kliman testified that the twins' placenta had been mislabeled by hospital medical staff, and the placenta samples labeled Twin A were actually from Christian, while the samples labeled Twin B were from Anabella. The Zamoras asserted that Dr. Kliman "claims this [mislabeling] proves that the damage[s] claimed by twin A were in fact pre-existing and inevitable." The Zamoras argued that they "could not reasonably have known that the defense expert would claim that defendant hospital employees switched the placentas, and so would not reasonably have designated an expert in the very select sub-specialty implicated by that change." They also argued that Dr. Kliman's testimony "impeach[es] the integrity and accuracy of the medical records" relied upon by the Zamoras.

The defendants opposed the motion. Dr. Palitz argued that the Zamoras' motion was "a repeat of the first motion" that the trial court denied in April 2009 and the proper way to raise the issue again would have been a motion for reconsideration. Dr. Palitz further argued that it was irrelevant that the placentas were mislabeled because each twin had the same infection. The Zamoras should have known about the infection because they had the hospital's pathology report by Dr. Purvis, which showed that both placentas had acute chorioamnionitis. Even if they had not hired a pathologist before the parties exchanged expert witness lists, the Zamoras "would have been on alert as to the placenta issue when defendant disclosed two expert witnesses who were pathologists."

Similarly, the hospital asserted that the misidentification of the placentas "did not have significant bearing on the causation issues in this case." It pointed out that the Zamoras' expert, Dr. Maureen Sims, stated during her deposition that the issue of misidentification was irrelevant to her opinions regarding causation.

9.

In their reply brief, the Zamoras argued that the defendants withheld their contention that the placentas were mislabeled and that Dr. Kliman's testimony was a surprise that *required* the court to grant them leave to augment. The Zamoras, however, did not respond to the defendants' claim that, since both twins' placentas had infection, the mislabeling was not relevant to the issues of causation and damages.

The court heard argument on the motion on January 21, 2010. The hospital's counsel pointed out that, after the initial exchange of expert witness lists on December 8, 2008, the Zamoras had the right as a matter of statute to augment their expert witness list. Since the defendants' expert witness lists included a placental pathologist to address causation, the Zamoras knew then that placental pathology was an issue in the case, but they failed to add their own expert pathologist within 20 days.

Dr. Palitz's counsel argued:

"The issues surrounding the placental pathologist and infection have always been there. In fact, it's extremely disingenuous and unbelievable to think that [the Zamoras'] counsel is surprised by anything that has to do with placental pathology, because [the Zamoras' counsel] indicated at the last hearing on their motion to augment that they had, in fact, retained a placental pathologist …. [¶] What they are doing is basically expert-shopping. At the last motion, they wanted to disclose … a certain placental pathologist. [¶] In this motion, they want to disclose a completely different placental pathologist. They have had years to look for placental pathologists."

Dr. Palitz's counsel also maintained that the mislabeling of the placentas was not relevant to the case. She argued that, assuming they wanted their own expert placental pathologist to determine whether the placentas were mislabeled, the Zamoras "have failed to establish why that would even be beneficial to them. [¶] [T]heir causation expert has already testified a few weeks ago that her opinion regarding causation has nothing to do with whether the placentas were misidentified or not."

The Zamoras' counsel responded that he had detrimentally relied on the hospital's records (including Dr. Purvis's pathology report), and the defendants "intentionally failed

10.

to disclose … that they were going to disagree with their own pathologist .…" He called the defendants' actions "the ultimate sandbag."

The trial court denied the Zamoras' request to add a pathologist as an expert witness. The court's written ruling explained:

> "[The Zamoras] seek to add pathologist Arturo Mendoza, M.D. as an expert. The [Zamoras] contend that adding Dr. Mendoza is justified because the original pathology and report prepared by Robert Purvis, M.D. may have been switched. However, apparently the samples are of the twins though the names may be switched. (Court notes that [Zamoras'] expert Dr. Sims testified that this switch does not really matter.)
>
> "On or about May 1, 2007, [the Zamoras'] counsel served a demand for production covering 'specimens, slides, photographs or written reports pertaining to the labor and delivery of the twins.' [¶] On July 15, 2007, six (6) re-cut placental slides were mailed to [the Zamoras'] counsel.
>
> "On March 26, 2009, [the Zamoras'] counsel asked defense counsel to stipulate to [the Zamoras] adding pathologist Dr. Marvin Pietruszka 'to testify concerning the causation issues that we anticipate might be raised in relationship to the placental slides, the fetal fibronectin test and potentially other issues within his expertise.'
>
> "[The Zamoras'] counsel then made a motion to augment experts which was denied on April 30, 2009 for failure to give any reason for the lateness of the motion. The moving declaration failed to address CCP § 2034.620(c).
>
> "The issues of causation and infection have been in this case from the beginning.
>
> "This motion as to the new pathologist is, in reality, a disguised motion for reconsideration. As such the motion as to Dr. Mendoza, the pathologist is DENIED. [I]t is clear that going back to July of 2007 issues relating to the placenta which would require a review by a pathologist were known to counsel for the [Zamoras]."

The court granted the part of the motion requesting leave to add a neuroradiologist to the expert witness list, finding that the Zamoras had failed to name a neuroradiologist earlier as a result of mistake, inadvertence, surprise, or excusable neglect.

11.

***Trial***

A jury trial began on February 15, 2011. We summarize some of the expert testimony presented by both sides.

The Zamoras' expert perinatologist, Brian Koos, explained that the chorioamnionitis diagnosed by Dr. Purvis was subclinical, meaning there were no observed clinical symptoms of infection, such as maternal fever, rapid heart rate, a tender uterus, or foul discharge from the cervix. There was no evidence of infection in the amniotic fluid, which surrounds the fetus. Nor did the babies have symptoms of infection immediately after they were delivered. Evidence of infection would include low blood pressure, low heart rate, and low platelet count.

Dr. Koos testified that a woman at risk of preterm labor should be given tocolytics to try to quiet the uterus and prolong the pregnancy and corticosteroids to help enhance the lung maturity of the fetus. He testified that the standard of care for a patient such as Christina (when she presented at the emergency room with contractions) would have been to keep her in the hospital for at least 12 hours to assess her response to the tocolytics and to give the steroids time to work. In addition, a nurse or doctor should have conducted an exam to determine whether there was any effacement of the cervix, that is, whether it had started to thin out. During labor, effacement of the cervix precedes dilation. Determining whether there is effacement requires palpating the cervix; a visual inspection would not show whether the cervix had become thin.

According to Dr. Koos, Dr. Palitz's instructions to the nurse to give Christina nifedipine and then send her home after 30 minutes were "[t]otally inappropriate." He opined that if Christina had not been discharged from the hospital and had received tocolytics and steroids, there would have been "a more likely chance of forestalling delivery for … 24 to 48 hours," which would have been sufficient time for the steroids to have a therapeutic effect.

Dr. Sims, the Zamoras' expert neonatologist, testified that the timely administration of tocolytics and steroids would have improved the twins' outcome. She explained that a full treatment of steroids is 48 hours prior to delivery, but partial treatment, such as 12 hours, has been shown to be beneficial. Dr. Sims opined that if Christina had received tocolytics and steroids, she likely would have gone 48 hours or more before delivery. Her opinion was based on the circumstances that this was Christina's first pregnancy, the cervix was closed, and there was no rupture of membranes. Dr. Sims testified that pregnancy can be prolonged for 48 hours even when it is later discovered there was subclinical chorioamnionitis. In this situation, there is little likelihood that a baby will become infected.

Dr. Sims believed that neither Anabella nor Christian was infected at birth, nor had either twin suffered brain injury before birth. She attributed Anabella's poor outcome (compared with Christian) to the perforated bowel and subsequent cardiac arrest she suffered when she was seven days old. She testified that if Christina had been given steroids, it was more probable that Anabella would not have suffered a perforated bowel. Considering the hospital's pathology report, Dr. Sims believed the funisitis found in Twin B's placenta was more consistent with Christian's condition at birth because he had a low white blood cell count and a "rockier course" than Anabella immediately after birth. In cross-examination, she agreed that Christina's labor was likely brought about by chorioamnionitis caused by an infection ascending from the vagina.

Dr. Kliman, the defense expert pathologist, specialized in the study of placentas. He described the placenta as the root system for a fetus; it supplies oxygen and nutrients to the fetus. Dr. Kliman reviewed the hospital's pathology report and obtained additional placental slides from the hospital, which he examined himself. He testified that when he reviewed the pathology report, the description of the placenta for Twin A did not match the clinical history of Anabella and, similarly, the description of the placenta of Twin B did not match the clinical history of Christian. Because Anabella and Christian have

13.

different blood types (Anabella is blood group B and Christian is blood group O), Dr. Kliman was able to identify which placenta corresponded with which twin by determining the blood type of the blood cells in the placental slides. His testing showed that the placenta labeled Twin A was from Christian and the placenta labeled Twin B was from Anabella. He testified that his testing was "a hundred percent foolproof way" to identify the placenta. He further stated: "So I'm just [fixing] that mislabeling. That can sometimes happen. It's not surprising. It happened in this case."

Dr. Kliman then discussed the placental slides he determined were from Anabella. The membranes were completely filled with neutrophils—the white blood cells that fight bacteria—and there was no tissue left. He opined that this was "a very severe infection that has been around for many, many days." The placental slides from Christian showed many fewer neutrophils. Dr. Kliman explained that Anabella was born first, which meant she was closer to the cervix, where the infection was coming from. He believed, as a consequence, the infection was with her longer and was more severe. He testified: "That's why Christian is doing better than [Anabella] because of the difference between the degrees of infection and the timing and where they were just by chance located in the uterus. One was closer to the cervix; one was farther away."

Dr. Kliman also observed syncytial knots in the placentas. He explained that in a normal pregnancy, at about 35 weeks, the placenta starts to make these knots, which release a hormone that causes the fetus to make steroids. These steroids, in turn, prepare the fetus for delivery. In a premature delivery where there has been an infection for days, the infection stimulates the placenta to make these syncytial knots early. He testified: "Those syncytial knots are basically telling the fetus, we have to get out of here. There is a problem. We can't stay in here any longer. Get ready for delivery." Both twins' placentas had syncytial knots, but Anabella's were more marked than Christian's because she had been infected for more days. Based on the spread of the neutrophils through the placental tissues, Dr. Kliman believed that Christian had been infected for at least 72

hours and Anabella had been infected longer than that. He explained, "We can time how long the infection has been there by how long it takes these neutrophils to get through the tissue." "It takes about 24 hours for those cells just to start; takes another 24 hours to get in the middle; and another 24 … to get to the top [of the chorionic plate]."

Dr. Kliman opined that nothing could have been done to stop Christina's preterm labor because of the severity of the infection. Administering steroids would not have made a difference because the "fetuses were maximally exposed to steroids" already from the syncytial knots. Antibiotics would not have changed the outcome either. Finally, he testified that if the fetuses had stayed in the uterus any longer, Anabella likely would have died and Christian would have been damaged.

Gilbert Martin, the defense expert neonatologist, testified that, in his opinion, if Christina had been kept at the hospital instead of discharged and given a continuous course of tocolytics, it would not have prolonged the pregnancy. His opinion was based on the fact that Christina had subclinical chorioamnionitis, and tocolytics do not work when there is chorioamnionitis. Dr. Martin also testified that steroids have no appreciable effect if given for only 12 hours. So, if steroids had been given to Christina at 3:00 a.m., there would not have been enough time to have an appreciable effect on the babies. He testified that, even if Christina had been given tocolytics, antibiotics, and steroids continuously instead of being discharged from the hospital, the outcome would not have been different.

Defense expert Richard Sweet is a professor of obstetrics and gynecology with a specialty in infectious diseases. He believed that Christina's subclinical infection caused her to go into pre-term labor. He explained that the immune system's response to infection (1) initiates a process that begins to soften the cervix and (2) stimulates the production of a hormone called prostaglandins that causes the uterus to contract. Dr. Sweet gave his opinion that the twins probably would have been born at the same time even if Christina had received additional tocolytics. He also testified that a study has

shown that, where there is chorioamnionitis and funisitis, a full course of steroids has no effect on the baby.

The jury reached a verdict on March 22, 2011. It found that Dr. Palitz was "negligent in the diagnosis or treatment of Christina Zamora," but did not find that his negligence was a substantial factor in causing harm to Anabella or Christian.

## *DISCUSSION*

The only issue on appeal is whether the trial court abused its discretion in denying appellants' second motion for leave to add a pathologist to their expert witness list. We begin our discussion with a brief overview of the statutes governing expert witness disclosure.

Section 2034.260 provides, "All parties who have appeared in the action shall exchange information concerning expert witnesses in writing on or before the date of exchange specified in the demand." (§ 2034.260, subd. (a).) The expert witness list must include, among other things, the expert's qualifications and "[a] brief narrative statement of the general substance of the testimony that the expert is expected to give." (*Id*., subd. (c)(1) & (2).)

Within 20 days after the exchange of expert witness lists, a party may supplement his or her expert witness list with "any experts who will express an opinion on a subject to be covered by an expert designated by an adverse party to the exchange …." (§ 2034.280, subd. (a).) Supplementing an expert witness list may occur because "the exchange reveals that one party plans to call experts on subjects the opposing party assumed would *not* require expert testimony." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 8:1686, p. 8J-18 (rev. # 1, 2010).) "In such cases, the opposing party has the right to supplement its expert witness exchange by adding experts to cover subjects on which the opposing party indicates it plans to offer expert testimony, and on which it had not previously retained an expert to testify." (*Ibid*., italics omitted.)

16.

After the time to supplement expert witness lists has passed, a party may ask for leave from the court to augment or amend an expert witness list.  (§ 2034.610.)  Under section 2034.620:

"The court shall grant leave to augment or amend an expert witness list … only if all of the following conditions are satisfied:

"(a) The court has taken into account the extent to which the opposing party has relied on the list of expert witnesses.

"(b) The court has determined that any party opposing the motion will not be prejudiced in maintaining that party's action or defense on the merits.

"(c) The court has determined either of the following:

"(1) The moving party would not in the exercise of reasonable diligence have determined to call that expert witness or have decided to offer the different or additional testimony of that expert witness.

"(2) The moving party failed to determine to call that expert witness, or to offer the different or additional testimony of that expert witness as a result of mistake, inadvertence, surprise, or excusable neglect, and the moving party has done both of the following:

"(A) Sought leave to augment or amend promptly after deciding to call the expert witness or to offer the different or additional testimony.

"(B) Promptly thereafter served a copy of the proposed expert witness information concerning the expert or the testimony described in Section 2034.260 on all other parties who have appeared in the action.

"(d) Leave to augment or amend is conditioned on the moving party making the expert available immediately for a deposition … and on any other terms as may be just, including, but not limited to, leave to any party opposing the motion to designate additional expert witnesses or to elicit additional opinions from those previously designated, a continuance of the trial for a reasonable period of time, and the awarding of costs and litigation expenses to any party opposing the motion."

Here, appellants do not dispute that the date for exchanging expert witness lists in this case was December 8, 2008.  They did not list a pathologist at that time, nor did they

17.

supplement their expert witness list in the next 20 days. Their motion filed on December 15, 2009, was brought pursuant to sections 2034.610 and 2034.620.

We review the court's decision denying their motion for an abuse of discretion. "The decision [whether] to grant relief from the failure to designate an expert witness is addressed to the sound discretion of the trial court and will not be disturbed on appeal absent a showing of manifest abuse of that discretion." (*Dickison v. Howen* (1990) 220 Cal.App.3d 1471, 1476 (*Dickison*).)

In this case, appellants previously filed a motion to augment their expert witness list to add a pathologist in April 2009. At that time, appellants sought to add Dr. Pietruszka to provide testimony on "causation and damages issues related to the placental slides …." During oral argument, appellants' attorney acknowledged that he now understood the need for a placental pathologist, stating, "I should have designated a forensic pathologist in view of what I can now see is the defense raising the specter of this chorioamnionitis and this infection from the placenta." The court found appellants' motion "totally insufficient" because there was nothing in the moving papers addressing the findings necessary to grant the motion. Appellants had failed to provide any evidence of either "reasonable diligence" (§ 2034.620, subd. (c)(1)) or "mistake, inadvertence, surprise, or excusable neglect" (*id*., subd. (c)(2)). Although appellants' counsel claimed mistake during oral argument, an attorney's unsworn statement in court is not evidence. (See *Homes on Wheels v. City of Santa Barbara* (2004) 119 Cal.App.4th 1173, 1179; *People v. Superior Court (Crook)* (1978) 83 Cal.App.3d 335, 341.)

Appellants did not attempt to cure their motion. For example, they did not immediately refile the motion (or seek reconsideration), including competent evidence of mistake, inadvertence, excusable neglect, or other circumstance that would permit augmentation under section 2034.620, subdivision (c). Instead, they waited over six months and then moved to augment their expert witness list to add a different pathologist. They stated that Dr. Mendoza would provide testimony on "the placental pathology,

18.

related laboratory studies, and related issues, causation," a description similar to the description of Dr. Pietruszka's proposed testimony.  Appellants argued that they were entitled to augment their expert list with a new pathologist because they could not have reasonably known that the defense expert would claim the placentas had been switched.

Dr. Palitz and the hospital both responded that the alleged surprise revealed at Dr. Kliman's deposition—the mislabeling of the placentas—was not particularly relevant to the case.  The hospital further explained that Dr. Kliman's deposition testimony showed that *both* placentas had severe chorioamnionitis and delivery could not have been delayed. It argued, "It makes no difference which placenta was more severely infected.  The fact that there was a severe infection caused the delivery."  Dr. Palitz argued that the motion was simply a disguised motion for reconsideration of the appellants' earlier motion seeking to add an expert pathologist.

Appellants did not attempt to explain the relevance of the mislabeling of the placentas, either in their reply brief or during oral argument.  Nor did they address the defendants' claim that their motion was the same as their earlier motion for leave to augment their expert witness list.

Viewed in light of this procedural history, we cannot say the trial court abused its discretion by denying appellants' motion.  The court observed that the issues of causation and infection had been in the case from the beginning.  It explained, "[G]oing back to July of 2007[,] issues relating to the placenta which would require a review by a pathologist were known to counsel for the [Zamoras]."  Thus, the court implicitly found that appellants had failed to meet the requirements of section 2034.620, subdivision (c)(1); that is, appellants failed to show they "would not in the exercise of reasonable diligence have determined to call that expert witness .…"  Given the issues raised by the defendants (and Dr. Purvis's pathology report itself), a reasonably diligent litigant would have consulted with pathologists and identified an expert witness to address the placental slides in a timely manner.

19.

Appellants contend that the trial court erred by treating the motion as a disguised motion for reconsideration under section 1008. We agree with Dr. Palitz, however, that the court's reference to a disguised motion for reconsideration does not imply that the court applied the procedural requirements of section 1008 to deny their motion. Rather, we understand the court's reference to the earlier motion as part of its basis for rejecting appellants' claim of surprise. Given the similarity between Dr. Mendoza's proposed testimony and the earlier proposed testimony of Dr. Pietruszka, it was evident to the court that appellants were using the mislabeling of the placentas as a reason to add an expert pathologist to testify on infection issues appellants had been aware of for months, if not years. Because we are not persuaded by appellants' claim that the court treated their motion as a motion for reconsideration under section 1008, we also reject their claim that the court failed to apply the relevant legal criteria.

Appellants' remaining contentions are not persuasive. They argue they were entitled to rely on the accuracy of the hospital's pathology report and cite Evidence Code section 1271, the business-record exception to the hearsay rule. This evidentiary rule shows only that Dr. Purvis's pathology report may have been admissible evidence. It does not support the appellants' claim that it was necessarily reasonable for them to rely on the pathology report's veracity.[5] Nor does the business-record exception to the hearsay rule suggest that the defendants somehow had an obligation to give notice to the Zamoras of their intention to present evidence that contradicted the pathology report in one respect.

---

[5]*People v. Utter* (1972) 24 Cal.App.3d 535, 553, overruled on other grounds by *People v. Morante* (1999) 20 Cal.4th 403, 432, footnote 16, cited by appellants, stands only for the proposition that hospital records are admissible evidence. In this case, no party objected to admitting Dr. Purvis's pathology report into evidence. *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, cited by appellants, is completely inapposite; it does not deal with medical records at all.

Appellants also contend that a change of testimony by a witness constitutes surprise that warrants leave to amend an expert witness list. In this case, however, there is no claim that any witness changed his testimony. Appellants do not contend, for example, that Dr. Purvis's testimony at trial was different from his testimony in his deposition. The cases cited by appellants are not pertinent to this appeal. In *Whitfield v. Debrincat* (1937) 18 Cal.App.2d 730, 732-734, the trial court granted the defendant in a personal injury action a new trial based on surprise, where the defendant's own witness averred in support of the new trial motion that he had been confused at trial and had intended to testify differently. The appellate court held that it could not say that the lower court had abused its discretion in granting a new trial under those circumstances. (*Id.* at p. 734.) In *Basham v. Babcock* (1996) 44 Cal.App.4th 1717, 1723, the court held that a party that has designated an expert on a particular subject could not use a supplemental expert list to substitute a new expert on the same subject. In *Andersen v. Howland* (1970) 3 Cal.App.3d 380, 382-383, the prevailing plaintiff in a personal injury action moved for a new trial based on newly discovered evidence of additional injuries. The trial court found the plaintiff had exercised due diligence. The appellate court concluded that the trial court did not abuse its discretion, but noted that a finding of lack of due diligence may not have been an abuse of discretion either. (*Id.* at pp. 383-384.) In *Vise v. Rossi* (1957) 150 Cal.App.2d 224, 225-226, the defendant in a personal injury action filed a motion for a new trial based on an affidavit from his own medical witness that he had examined the plaintiff's x-rays after the trial and determined her injuries were not as extensive as he previously believed. The trial court denied the motion. The appellate court did not review the order denying a new trial but observed that the lack of diligence may have justified the denial. (*Id.* at p. 227.) These cases simply are of no help to appellants.

*Dickison*, *supra*, 220 Cal.App.3d 1471, cited by appellants also is not on point. In *Dickison*, a medical malpractice case, the trial court allowed the defendant, Dr. Howen, to

augment his expert witness list after *his own expert*, Dr. Smith, testified in deposition that Dr. Howen breached the standard of care.  (*Id*. at p. 1475.)  In support of the motion to augment, Dr. Howen's attorney stated that he had met twice with Dr. Smith before the deposition and both times he had given his opinion that Dr. Howen's care was within the standard of care; the attorney also told the court he was shocked by Dr. Smith's deposition testimony.  (*Id.* at pp. 1476-1477.)  After a defense verdict, the plaintiff appealed, arguing that the trial court abused its discretion by granting Dr. Howen's motion to augment.  (*Id.* at p. 1476.)  The appellate court found "no abuse of discretion in the trial court's determination that the change in Dr. Smith's testimony was a surprise which Dr. Howen could not have prevented."  (*Id.* at p. 1478.)  The *Dickison* court observed that the trial court believed Dr. Howen's attorney, and "we [the appellate court] will not question it."  (*Ibid*.)

Unlike *Dickison*, appellants were not surprised by one of their own witnesses' deposition testimony.  Instead, they claim they were surprised by Dr. Kliman's deposition testimony.  They offer no authority for their position that a party should be allowed to augment his or her expert witness list based on surprise about the opinions of an *opposing party's* expert witness.

In any event, appellants have failed to demonstrate prejudice.  Appellants contend that the mislabeling of the placentas was central to the defense case.  They assert:  "The [jury] verdict rests on the theory of a catastrophic but undetected infection that would have contra-indicated delaying delivery by tocolytics, and which made it impossible to delay delivery ….  That theory depended entirely on undermining [the hospital's] pathology reports with Dr. Kliman's arcane and undocumented immunohistochemistry methods, and on impeaching *the entire clinical record*—which showed only mild to moderate chorioamnionitis in both twins, more severe infection in Christian, and none of the common symptoms of maternal infection."

As Dr. Palitz points out, however, the original hospital pathology report documented the presence of marked acute chorioamnionitis in one placenta, noting infiltration of neutrophils, necrosis in the fetal membranes, the presence of syncytial knots, and funisitis. In the other placenta, Dr. Purvis documented moderate acute chorioamnionitis with moderate infiltrate of neutrophils and the presence of syncytial knots. Dr. Purvis did not use the word "mild" in describing the infection of either placenta. Although Dr. Kliman determined that the placental samples had been mislabeled, he testified in his deposition that his own findings were generally consistent with Dr. Purvis's qualitative findings.

We agree with appellants that the jury's finding of no causation rested on the defense theory that tocolytics and steroids would not have prolonged the pregnancy or improved the outcome for the twins. We are not persuaded, however, by their claim that this theory hinged on the mislabeling of placentas. According to the defense experts, it was the severity of the infection—not which fetus had the more severe infection—that caused the preterm delivery. Appellants do not point to any expert testimony indicating that the same levels of infection would have led to a different outcome if Christian rather than Anabella had been more severely affected.

Further, appellants have not established what their proposed expert would have said that would have undermined Dr. Kliman's blood-type-testing methods. In their motion, appellants wanted to add Dr. Mendoza as an expert witness allegedly to address the "very select sub-specialty implicated" by Dr. Kliman's finding that the placentas had been mislabeled. They did not, however, describe Dr. Mendoza's proposed testimony in sufficient detail to demonstrate to the trial court how he would address the mislabeling of the placentas as opposed to the general issue of infection in both placentas. Even on appeal they do not claim they have an expert who will dispute Dr. Kliman's determination of blood types. Appellants only claim that the prejudice flowing from the denial of their motion for leave to add an expert pathologist is "manifest from the record." Appellants'

argument that they were prejudiced by the court's ruling is based on the importance of Dr. Kliman's testimony to the defense because he testified on the severity of the infection in the fetal tissues. We observe, however, that appellants are appealing the denial of their motion for leave to *add* an expert, not to *exclude* the testimony of Dr. Kliman.

Our state Constitution provides that "[n]o judgment shall be set aside, or new trial granted, in any cause, ... for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "The burden is on the appellant in every case to show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice." (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82.) "Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) In this case, appellants have not met their burden of establishing a miscarriage of justice.

### *DISPOSITION*

The judgment is affirmed. Costs are awarded to respondents.

_____
Wiseman, Acting P.J.

WE CONCUR:


_____
Kane, J.


_____
Peña, J.